# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-1854, 12-2011 & 12-2058

WISCONSIN EDUCATION ASSOCIATION COUNCIL, et al.,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

SCOTT WALKER, Governor of Wisconsin, et al.,

*Defendants-Appellants,*
*Cross-Appellees.*

APPEAL OF:

KRISTI LACROIX, et al.,

*Proposed Intervenors/*
*Appellants, Cross-Appellees.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 11-cv-00428—**William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 24, 2012—DECIDED JANUARY 18, 2013

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2011, the Wisconsin Legislature passed Act 10, a budget repair bill proposed by recently

elected Governor Scott Walker. Act 10 significantly altered the state's public employee labor laws, creating two distinct classes of public employees—a select group of "public safety employees" with the remainder classified as "general employees." Among other things, the Act prohibited general employees from collectively bargaining on issues other than "base wages," imposed rigorous recertification requirements on them, and prohibited their employers from deducting union dues from paychecks. The Act did not, however, subject public safety employees or their unions to the same requirements; they kept the same rights they had under the pre-Act 10 scheme. The proposal and subsequent enactment of Act 10 was controversial and received nationwide publicity. *See Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 144-45 (7th Cir. 2011).

Plaintiffs and cross-appellants, representing seven of Wisconsin's largest public sector unions (the "Unions"), filed suit against defendants-appellants Governor Scott Walker and other state actors, challenging three provisions of the statute—the limitations on collective bargaining, the recertification requirements, and a prohibition on payroll deduction of dues—under the Equal Protection Clause. They also challenged the payroll deduction provision under the First Amendment. The district court invalidated Act 10's recertification and payroll deduction provisions, but upheld the statute's limitation on collective bargaining. We now uphold Act 10 in its entirety.

## I. Background

### A. Factual Background

Wisconsin grants public sector employees the right to bargain collectively through two principal labor laws—the Municipal Employment Relations Act ("MERA") and the State Employee Labor Relations Act ("SELRA")—that define the rights of employees and unions as well as their relationship with governmental employers. Act 10 amended these statutes, imposing new burdens on a group labeled "general employees." 2011-2012 Wis. Legis. Serv. 29 (West). Unions representing "public safety employees," however, continued operating under the pre-Act 10 scheme. Proposal and enactment of Act 10 triggered widespread protest from Wisconsin's public sector labor unions, including the Unions' challenge to the constitutionality of certain provisions of Act 10.

### 1. Act 10 Creates Two Categories of Public Employees

All of the Unions' constitutional claims arise from the legislature's decision to subject general employees but not public safety employees to Act 10's restrictions on union activity. All employees governed by MERA and SELRA are "general employees" unless specifically identified as "public safety employees" in Act 10. In creating this distinct group, the Act cross-references seven of the twenty-two occupations listed in a separate statute, which governs the Wisconsin Public Employee Trust Fund. *See* Wis. Stat. § 40.02(am). Under SELRA, Act 10 identifies state troopers and state motor vehicle

inspectors as public safety employees. Wis. Stat. § 111.81(15r). Act 10 did not, however, identify the Capitol Police and the University of Wisconsin Police as public safety employees, even though both occupations qualified as such under the trust fund statute. *Compare* Wis. Stat. § 40.02(am), *with* Wis. Stat. § 111.81(15r). Act 10's list of public safety employees under MERA is somewhat longer, including (1) police officers, (2) fire fighters, (3) deputy sheriffs, (4) county traffic police officers, and (5) village employees that perform fire or police protection. Wis. Stat. § 111.70(1)(mm).

Notably relevant to the arguments in this appeal, when Governor Walker ran for election in 2010, only five public employee organizations endorsed his candidacy during the campaign: (1) the Wisconsin Troopers Association, which represents state troopers and motor vehicle inspectors; (2) the Milwaukee Police Association; (3) the Milwaukee Professional Fire Fighters Association; (4) the West Allis Professional Police Association; and (5) the Wisconsin Sheriffs and Deputy Sheriffs Association Political Action Committee. Each of these organizations represents employees categorized as public safety employees under Act 10. The public safety employee definition, however, also includes employee organizations that opposed or failed to endorse the governor. For instance, all state, municipal, and village police officers and firefighters qualify as public safety employees even though only those in Milwaukee and police officers in West Allis endorsed Walker. In addition, the

Professional Firefighters of Wisconsin[1] and the Wisconsin Professional Police Association endorsed Walker's opponent. And the head of the Madison firefighters' union called for a general strike in response to Act 10, despite its employees' public safety classification.

### 2. Unions Challenge Three Parts of Act 10

The Unions challenge three different parts of Act 10: (1) limitations on the permissible collective bargaining subjects of general employees; (2) stricter recertification requirements for general employee unions; and (3) a prohibition on the payroll deduction of union dues for general employees.

First, prior to Act 10, MERA and SELRA permitted public employees to collectively bargain over a broad array of subjects including their wages and conditions of employment. Moreover, these unions could negotiate "fair-share" agreements, which require employees opting out of union membership to pay "their proportionate share of the cost of the collective bargaining process and contract administration." *See* Wis. Stat. § 111.81(9). Act 10, however, limits general employee unions to the single topic of the "total base wages and excludes any other compensation." Wis. Stat. §§ 111.70(1)(a), (4)(mb), 111.81(1), 111.91(3). It also forbids fair-share agreements. Wis. Stat. §§ 111.70(2), 111.845.

---

[1] The president of the Professional Firefighters of Wisconsin later ran against Governor Walker's lieutenant governor in a recall election seeking to oust both Governor Walker and his lieutenant governor.

Next, MERA and SELRA formerly permitted municipal or state employees to petition the Wisconsin Employment Relations Commission to hold an election to select a particular union as the employees' exclusive bargaining agent. Certification required a simple majority. Once certified, the union remained the employees' exclusive agent until thirty percent of the employees petitioned for a decertification election. That election required a simple majority to certify a union as the exclusive collective bargaining representative. Act 10, on the other hand, requires general employee unions to submit to an annual "recertification" election in which an absolute majority—"at least 51 percent of the votes of all of the general . . . employees in the collective bargaining unit" (not just those voting)—must approve the union to retain its status as the employees' agent. Wis. Stat. § 111.70(4)(d)3.b., 111.83(3)(b).

Third, under a separate statute, Wisconsin permitted state employees to allow their employer to deduct a portion of their salaries for "[p]ayment of dues to employe[e] organizations," including unions. Municipalities could do likewise, provided that they extended the opportunity to all employee organizations with members in the particular unit. *See Milwaukee Fed'n of Teachers Local 252 v. Wis. Emp. Relations Comm'n*, 266 N.W.2d 314 (Wis. 1978). Act 10 prohibits all payroll deductions for general employees. Wis. Stat. § 20.921(1)(a)2.

### B.  Procedural Background

The Unions filed suit in federal district court alleging that all three provisions violated the Equal Protection Clause because of the Act's differential treatment of public safety and general employees. They also claimed that the prohibition on payroll deductions for general employees violated the First Amendment on several grounds, including that the payroll deduction prohibition targeted employees who had not endorsed or otherwise politically supported Governor Walker when he ran for office in 2010.

### 1.  General Employees Move to Intervene

Several municipal employees (the "Employees") moved to intervene in defense of Act 10. *See* Fed. R. Civ. P. 24(a). They were not members of the union, but pre-Act 10 law required them to pay union expenses under a fair-share agreement. After Act 10, the Employees were classified as general employees and thus no longer responsible for these dues.

### 2.  Motion for Summary Judgment

The state moved for judgment on the pleadings, Fed. R. Civ. P. 12(c), and the Unions cross-moved for summary judgment on all claims, Fed. R. Civ. P. 56. Because the facts in the case are undisputed, the district court considered the motions together. The court also considered the Employees' motion to intervene.

The district court applied rational basis review to the equal protection claims and upheld the limitation on general employee collective bargaining. *Wis. Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d 856 (W.D. Wis. 2012). It found a rational basis in the state's belief that applying Act 10 to public safety employees might result in a retaliatory strike that jeopardized the public welfare. A similar strike by the general employees, the state believed, would be less damaging. *Id.* at 866-68. However, the district court found no rational basis for treating the two groups differently with respect to the recertification and payroll deduction provisions. *Id.* at 868-70. It further concluded that the payroll deduction provision violated the First Amendment because the court determined that the differing political viewpoints of, and endorsements by, employees in the two classifications were the only possible justifications for Act 10's prohibition on payroll deductions for general employees. *Id.* at 870-76. Consequently, the district court invalidated these portions of Act 10 and enjoined the state from enforcing the recertification and payroll deduction provisions. Defendants now appeal the recertification and payroll deduction judgment, while the Unions cross-appeal the adverse collective bargaining ruling.

The district court also denied the Employees' motion to intervene, concluding that their unique interest in the litigation was only "tangential" and that the state could adequately represent their interests. *Id.* at 860-61. Employees now appeal the denial of this motion to intervene.

## II. Discussion

We review a district court's ruling on summary judgment de novo, making all inferences of fact in favor of the non-moving party. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). We apply the same standard of review to a district court's ruling on a motion for judgment on the pleadings. *ProLink Holdings Corp. v. Fed. Ins. Co.*, 688 F.3d 828, 830 (7th Cir. 2012).

### A. Act 10 Does Not Violate the First Amendment

Act 10's payroll deduction prohibitions do not violate the First Amendment. The Unions offer several different First Amendment theories to rebut the compelling deference of rational basis review required under applicable law. Ultimately, none apply because the Supreme Court has settled the question: use of the state's payroll systems to collect union dues is a state subsidy of speech that requires only viewpoint neutrality. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358-59 (2009); *see also Regan v. Taxation with Representation*, 461 U.S. 540, 548 (1983). Admittedly, the Unions do offer some evidence of viewpoint discrimination in the words of then-Senate Majority Leader Scott Fitzgerald suggesting Act 10, by limiting unions' fundraising capacity, would make it more difficult for President Obama to carry Wisconsin in the 2012 presidential election. While Senator Fitzgerald's statement may not reflect the highest of intentions, his sentiments do not invalidate an otherwise constitutional, viewpoint neutral law. Consequently,

Act 10's prohibition on payroll dues deduction does not violate the First Amendment.

### 1. Use of the State's Payroll System to Collect Union Dues Subsidizes—Rather than Burdens—Speech

The Bill of Rights enshrines negative liberties. It directs what government may not do to its citizens, rather than what it must do for them. *See Smith v. City of Chi.*, 457 F.3d 643, 655-56 (7th Cir. 2006). While the First Amendment prohibits "plac[ing] obstacles in the path" of speech, *Regan*, 461 U.S. at 549 (citation omitted), nothing requires government to "assist others in funding the expression of particular ideas, including political ones," *Ysursa*, 555 U.S. at 358; *see also Harris v. McRae*, 448 U.S. 297, 318 (1980) (noting that Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of" a constitutional right). Thus, even though "publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, [states are] under no obligation to aid the unions in their political activities." *Ysursa*, 555 U.S. at 359.

In *Ysursa*, the Supreme Court squarely held that the use of a state payroll system to collect union dues from public sector employees is a state subsidy of speech. *Id.* As the Court explained, "the State's decision not to [allow payroll deduction of union dues] is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit." *Id.* Other circuits have

reached the same conclusion. *See Utah Educ. Ass'n v. Shurtleef*, 565 F.3d 1226, 1229-31 (10th Cir. 2009); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319-21 (6th Cir. 1998); *S. Car. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256-57 (4th Cir. 1989); *Brown v. Alexander*, 718 F.2d 1417, 1422-23 (6th Cir. 1983); *Ark. State Highway Emps. Local 1315 v. Kell*, 628 F.2d 1099, 1102 (8th Cir. 1980). Like the statutes in these cases, Act 10 places no limitations on the speech of general employee unions, which may continue speaking on any topic or subject. Thus, *Ysursa* controls, and we analyze Act 10 under the Supreme Court's speech subsidy cases.

The Unions try to distinguish *Ysursa* by noting that the prohibition in *Ysursa* applied across-the-board to unions representing all public employees, unlike Act 10's prohibition targeting only general employees. Thus, the Unions argue, unlike the subsidy in *Ysursa*, Act 10 actively imposes burdens on the speech of unions representing general employees. Indeed, two recent district court cases have relied on precisely this argument to distinguish *Ysursa* in finding First Amendment problems with payroll deduction statutes similar to Act 10. *See Bailey v. Callaghan*, 873 F. Supp. 2d 879, 885-86 (E.D. Mich. 2012); *United Food & Commercial Workers Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1125 (D. Ariz. 2011).

But the Unions' reasoning falters for two reasons: Act 10 erects no barrier to speech, and speaker-based discrimination is permissible when the state subsidizes speech. First, the prohibition on payroll deductions for

general employees does not erect a barrier to the Unions'
speech. As the district court here recognized, Act 10
diminishes speech only because it diminishes "the union's
ability to fund its speech." *Walker*, 824 F. Supp. 2d at
871. Thus, the "obstacle" to speech here is the cost of
speaking, an obstacle the state itself has not created. And
while the state may not erect "obstacles in the path of
[the unions'] exercise of . . . freedom of speech, it need
not remove those [obstacles] not of its own creation."
*Regan*, 461 U.S. at 549-50 (quoting *Harris*, 448 U.S. at 316)
(original brackets omitted); *see also Campbell*, 883 F.2d
at 1257 ("The state's failure to authorize payroll deduc-
tions for the [union] does not deny [union] members
the right to associate, to speak, to publish, to recruit
members, or to otherwise express and disseminate their
views."); *Brown*, 718 F.2d at 1423 (same). Importantly, Act
10 does not present a situation where the state itself
actively erected an obstacle to speech.[2] Thus, nothing
supports treating the selective prohibition of payroll
deductions as a burden on or obstacle to the speech
of general employee unions. Instead, Act 10 simply sub-
sidizes the speech of one group, while refraining from
doing so for another.

---

[2] The First Amendment would undoubtedly prohibit a state
law that itself raised the cost of the Unions' speech by, for
example, requiring payment of a fee to speak. *See Forsyth
Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 136-37 (1992)
(invalidating law imposing content-based fee on speech). Act 10
imposes no costs of its own, though. It merely declines to pay
a portion of the preexisting costs.

Second, such speaker-based distinctions are permissible when the state subsidizes speech. Nothing in the Constitution requires the government to subsidize all speech equally. A government subsidy "that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas." *Leathers v. Medlock*, 499 U.S. 439, 450 (1991); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 557-58 (1998) (noting legislatures "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech . . . at stake" and that such funding is not "discriminat[ion] on the basis of viewpoint [but] . . . merely . . . fund[ing] one activity to the exclusion of the other" (citation omitted)). As *Regan* explained, legislative "selection of particular entities or persons for entitlement to this sort of largesse is obviously a matter of policy and discretion not [ordinarily] open to judicial review[.]" 461 U.S. at 549 (internal quotations omitted). Indeed, the speech subsidy upheld in *Regan* discriminated on the basis of speaker—veterans' groups who engaged in lobbying could claim section 501(c)(3) status but other lobbying groups could not. *Id.* at 548-49; *see also Campbell*, 883 F.2d at 1255-56 (no First Amendment implications to statute that discriminated on the basis of speaker in authorizing payroll deduction for some public employee organizations but not others). Thus, that the state gave one category of public employees the benefit of payroll dues deduction does not run afoul of the First Amendment.

Unable to distinguish Act 10 from *Ysursa* and the Court's other speech subsidy cases, the Unions also liken

the state's payroll deduction system to a nonpublic forum.[3] *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 830, 834 (1995) (applying nonpublic forum analysis to a student activities fund used to reimburse the expressive activity of student organizations, noting that the fund was a "forum more in a metaphysical than a spatial or geographic sense"). But applying *Rosenberger* to this case would require us to ignore *Ysursa*, where the Supreme Court settled this question: it evaluated state-imposed restrictions on a union's use of state payroll systems under subsidy cases like *Regan*, rather than under *Rosenberger*'s nonpublic forum framework. 555 U.S. at 359 (citing *Regan*, 461 U.S. at 549); *but see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001) (noting in a subsidy case that certain "limited forum cases . . . may not be controlling in a strict sense, yet they do provide some instruction").[4] In fact,

---

[3] Regulation of nonpublic forums requires some level of heightened scrutiny. *See Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 49 (1983). Restrictions on the use of nonpublic forums must be viewpoint neutral and reasonable in light of the purpose served by the forum. *Id.* Although the Court has never named this level of scrutiny, in requiring a connection between the restriction and the purpose of the forum, *Perry* appears to require more scrutiny than simple rational basis, which will sustain a viewpoint neutral law that serves *any* legitimate government objective.

[4] *Velazquez* involved a subsidy to legal aid organizations that discriminated on the basis of viewpoint, requiring as a

(continued...)

the Unions cite no case applying nonpublic forum analysis to a state payroll system, and this Court is not aware of any. Other circuits likewise have consistently evaluated state payroll deductions as speech subsidies. *See Shurtleef*, 565 F.3d at 1229-31; *Pizza*, 154 F.3d at 319-21; *Campbell*, 883 F.2d at 1256-57; *Brown*, 718 F.2d at 1422-23; *Kell*, 628 F.2d at 1102.

Thus, *Ysursa* requires us to analyze Act 10 under First Amendment cases involving speech subsidies. Under those cases, Act 10 presents no free speech problem unless it invidiously discriminates on the basis of viewpoint.

### 2.  Act 10 Does Not Invidiously Discriminate on the Basis of Viewpoint

While the First Amendment does not require government to subsidize all speech equally, it does proscribe subsidies that discriminate on the basis of viewpoint. *Regan*, 461 U.S. at 548; *see also Ysursa*, 555 U.S. at 359; *Rosenberger*, 515 U.S. at 834. Act 10, however, is viewpoint

---

[4] (...continued)

condition of payment that the legal aid organization refrain from raising "arguments and theories Congress finds unacceptable[.]" 531 U.S. at 546. Thus, although *Velazquez* referenced the Court's nonpublic forum cases, it neither created nor applied an analogous form of heightened scrutiny in the subsidy context. Instead, by invalidating the viewpoint-based subsidy, *Velazquez* is entirely consistent with *Regan*'s sole limitation on speech subsidies—viewpoint neutrality.

neutral because it is neither facially discriminatory nor a neutral façade for viewpoint discrimination.

### a.  Act 10 Is, on Its Face, Viewpoint Neutral

On its face, Act 10 is neutral—it does not tie public employees' use of the state's payroll system to speech on any particular viewpoint. *See Velazquez*, 531 U.S. at 546-48 (speech subsidy viewpoint discriminatory when conditioned on recipient advancing particular viewpoint). Nevertheless, the Unions argue that Act 10 facially discriminates on the basis of viewpoint because general employee unions and public safety unions will necessarily espouse different viewpoints. Maybe they do. But this argument merely recycles the Unions' earlier assertion that speaker-based discrimination in the subsidy context requires heightened scrutiny. It does not. *See Regan*, 461 U.S. at 549-50 (citing *Harris*, 448 U.S. at 316). The cases cited by the Unions, which invalidated laws discriminating on the basis of speaker, confirm this principle. Each one—unlike Act 10—involved a law that actively created barriers to speech rather than mere subsidies. For example, *Citizens United v. FEC* involved a law that prohibited speech by forbidding certain speakers from spending money, akin to prohibiting speech altogether. 130 S. Ct. 876, 896-97 (2010). Similarly, the statute in *Sorrell v. IMS Health, Inc.*—like that in *Citizens United*—actually prevented pharmaceutical manufactures from engaging in certain types of commer-

cial speech. 131 S. Ct. 2653, 2663 (2012).[5] While *Sorell* and *Citizens United* support the unconstitutionality of speaker-based discrimination in statutes that prohibit or burden speech, *Regan* controls on government subsidies of speech: speaker-based distinctions are permissible. *Regan*, 461 U.S. at 548-49.

The mere fact that, in practice, the two categories of unions may express different viewpoints does not render Act 10 viewpoint discriminatory. The two groups here are no more likely to express different viewpoints (and the government subsidy no more likely to advantage a particular viewpoint) than the speaker-based distinction sanctioned in *Regan*. In that case, the advantaged group, veterans' organizations, undoubtedly held different viewpoints than those excluded from the subsidy; yet, the Court upheld the statute. *Id.* at 550-51. Indeed, the Unions' argument proves too much: if different speakers necessarily espouse different viewpoints, then any selective legislative funding decision would violate the First Amendment as viewpoint discriminatory. Such

---

[5] The Unions also suggest *Rosenberger* requires finding abridgment of free speech when a speech subsidy makes speaker-based distinctions. But that case actually recognizes just the opposite: *Rosenberger* explained that *Regan*, in upholding a speech subsidy, "relied on a distinction based on preferential treatment of certain speakers—veterans' organizations—and not a distinction based on the content or messages of those groups' speech." *Rosenberger*, 515 U.S. at 834. Thus, *Rosenberger* actually reaffirms *Regan*'s determination that government may subsidize the speech of some speakers but not others.

an interpretation of the First Amendment would leave legislatures with the unpalatable choice of funding all expressive activity or none at all.

Retreating somewhat from the argument that public safety and general employee unions necessarily espouse different viewpoints, the Unions next argue that the public safety/general employee distinction is "likely" to have a viewpoint discriminatory effect. *See Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*, 307 F.3d 566, 593-94 (7th Cir. 2002); *Chi. Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 699-700 (7th Cir. 1998). The courts in both *Southworth* and *Chicago Acorn* applied a nonpublic forum analysis to invalidate facially neutral policies that had the effect of viewpoint discrimination. *Southworth*, 307 F.3d at 593-94; *Chi. Acorn*, 150 F.3d at 699-700. In both cases, however, this effect inhered in the policy classification itself. The *Chicago Acorn* regulation, for example, waived rental fees for applicants who might generate favorable publicity. 150 F.3d at 699. This criterion, however, would inherently produce a discriminatory effect: "As applied to political applicants . . ., a favorable-publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large amounts of favorable publicity are respectable, popular politicians and re-spected, well-established political groups; pariahs need not apply." *Id.* at 699 (emphasis omitted). So too in *Southworth*, which involved two funding standards for student activities grants. One standard favored student organizations that had previously received funding; the other favored long-established organizations. 307 F.3d at 593. Because political and religious groups had previ-

ously been excluded from receiving funding, these two standards inherently disadvantaged religious and politically partisan viewpoints. *Id.* at 593-94. Unlike the classifications in *Chicago Acorn* and *Southworth*, however, Act 10's public safety and general employee distinction has no inherent connection to a particular viewpoint. In short, in *Chicago Acorn* and *Southworth*, a causal connection existed between the classifications and the discriminatory effect. In contrast, the connection between the classification in Act 10 and the Unions' perceived discriminatory effect is merely coincidental: a particular union's political views do not inhere in its status as a public safety union.[6] Consequently, the Unions' reliance on *Chicago Acorn* and *Southworth* is misplaced.

The distinction between public safety and general employee unions in Act 10 is facially neutral, and the Unions do not succeed in showing otherwise. Thus, we next consider whether Act 10 is a façade for invidious discrimination.

### b.  Act 10 Is Not a Façade for Invidious Discrimination

Because Act 10 itself does not facially discriminate on the basis of viewpoint, the Unions raise three other argu-

---

[6]  The Unions, of course, suggest that the relationship between the unions' political views and status as a public safety union is no mere coincidence. But, as explained in the next section, we cannot conclude Act 10 is a neutral façade for viewpoint discrimination.

ments suggesting that Act 10 presents a facially neutral façade for invidious viewpoint discrimination. These arguments require peering past the text of the statute to infer some invidious legislative intention. We decline this invitation.[7] First, the Unions rely on the correlation between particular unions' political endorsements of Governor Walker and the unions' statuses as public safety unions. Second, the Unions argue that Act 10 is underinclusive in a way that makes it "a mere pretext for an invidious motive." *See Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004). Finally, the Unions look to the statements of a particular legislator to find an invidious intent to discriminate.

The correlation between political endorsements and access to the payroll system does not render Act 10 viewpoint discriminatory. That the benefits of Act 10's subsidy may fall more heavily on groups with one par-

---

[7] The dissent suggests that *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 811 (1985), compels a searching look beyond the text of the statute. (Dissenting op. at 49-50, 53.) We do not read *Cornelius* that broadly. *Cornelius* simply "decline[d] to decide in the first instance whether the exclusion of respondents [from the Combined Federal Campaign] was impermissibly motivated by a desire to suppress a particular point of view." *Id.* at 812-13. "Respondents," the Court noted, were "free to pursue this contention on remand." *Id.* at 813. We find nothing in this passage or any other language from *Cornelius* that encourages federal courts to search for some invidious motive when confronted with a facial challenge to a facially-neutral statute.

ticular viewpoint does not transform a facially neutral statute into a discriminatory one. In *Hill v. Colorado*, for example, a statute prohibited people from approaching within eight feet of any other person outside a healthcare facility for purposes of any oral protest, education, or counseling. 530 U.S. 703, 709-10 (2000). According to the Court, the statute was neither content- nor viewpoint-based, even though the legislative history made "clear" that protests near abortion clinics "primarily motivated" the statute and its burdens would fall disproportionately on the speech of those protestors.[8] *Id.* at 715.

---

[8] We see viewpoint neutrality as a broadly applicable requirement to all laws implicating First Amendment concerns with a test that does not vary. Thus, unlike the dissent, we do not distinguish among cases analyzing viewpoint neutrality in the time, place, and manner context and the circumstances present here.

Moreover, time, place, and manner regulations of speech must satisfy additional requirements beyond those imposed on regulations of nonpublic forums. While regulation of nonpublic forums requires only viewpoint neutrality and "reasonable[ness] in light of the purpose served by the forum," *Cornelius*, 473 U.S. at 806 (citing *Perry Educ. Ass'n*, 460 U.S. at 49), the First Amendment requires much more of time, place, and manner restrictions. They must be content neutral (which includes both viewpoint and subject-matter neutrality, *see Hill*, 530 U.S. at 723); serve a legitimate, substantial government interest; be narrowly tailored to serving that interest; and leave open ample alternative means of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). Thus, it

(continued...)

Indeed, the Supreme Court has made clear that a policy is not "vulnerable to constitutional assault . . . because it systematically and predictably burdens most heavily those groups whose viewpoints are out of favor with the . . . mainstream." *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2994 (2010); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."); *Pilsen Neighbors Cmty. Council v. Netsch*, 960 F.2d 676, 688 & n.9 (7th Cir. 1992) (noting "plaintiffs were denied access into the program because of their status, not because of their views"). Act 10 is no different—that it disproportionately impacts groups with one particular viewpoint does not transform its facially neutral language into an invidiously discriminatory statute. Moreover, as a factual matter, the public safety category includes several unions that did not endorse Governor Walker—for example, none of the municipal police and firefighters unions, except those in Milwaukee and West Allis, endorsed Governor Walker.

Nor does the Unions' underinclusivity argument fare any better. According to the Unions, Act 10 is under-inclusive because several occupations that ensure public

---

[8] (...continued)
seems counterintuitive that viewpoint neutrality would receive closer judicial scrutiny in an area of speech like regulation of nonpublic forums than in an area subject to stiffer constitutional requirements, like time, place, and manner restrictions.

safety were omitted from the definition of "public safety employees." This underinclusivity, the Unions argue, presents a facially neutral façade concealing "a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gileo*, 512 U.S. 43, 51 (1994) (internal quotations omitted); *see also Ridley*, 390 F.3d at 86 (underinclusive regulations can suggest "viewpoint discrimination is afoot"). The district court seemingly agreed, concluding that "the only apparent reason for discriminating between the [two types of unions] is their different viewpoints." *Walker*, 824 F. Supp. 2d at 876 (emphasis omitted). Indeed, the Supreme Court has, on occasion, expressed reservations about underinclusive regulations of speech. In *City of Ladue*, the Court did recognize that "the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles," and that "through the combined operation of a general speech restriction and its exemptions, the government might seek to select the permissible subjects for public debate and thereby to control . . . the search for political truth." 512 U.S. at 51 (emphasis in original) (internal quotations omitted).[9] Likewise, *Brown v. Entertainment Merchants Ass'n* explained that "[u]nderinclusiveness raises serious doubts

---

[9] The Court never reached the question of whether the exemptions in *City of Ladue* rendered the statute underinclusive in a way that violated the First Amendment, though, because the Court concluded that the ban itself—regardless of any exemptions—violated the First Amendment. 512 U.S. at 58.

about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." 131 S. Ct. 2729, 2740 (2011).

Neither case applies here, though. First, in *City of Ladue*, the Court worried only about underinclusivity driven by content discrimination. Thus, the First Amendment does not forbid all underinclusivity but only underinclusivity that "restricts too little speech because [the law's] exemptions *discriminate on the basis of the signs' messages*." 512 U.S. at 51 (emphasis added). Only content-based or viewpoint-based exemptions implicate the concerns voiced in *City of Ladue*. The Court re-affirmed this view in *R.A.V. v. City of St. Paul*, explaining that "the First Amendment imposes not an 'under-inclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech." 505 U.S. 377, 387 (1992). As explained above, Act 10 contains no content- or viewpoint-discriminatory exemption. Instead, its exemption differentiates on the basis of speaker without reference to whatever viewpoint that speaker may hold. *Brown* does not alter this conclusion; in that case, the Court relied on underinclusivity when determining whether the statute was narrowly tailored so as to survive strict scrutiny. 131 S. Ct. at 2738. Moreover, as the district court recognized, both of these cases involved active prohibitions on speech. Neither involved the situation in this case, where the state merely declines to subsidize speech.

Left with a facially viewpoint neutral state subsidy of speech, both the Unions and the district court ultimately

rely on the floor statements of Senator Fitzgerald, who, rising in support of Act 10, explained "[i]f we win this battle, and the money is not there under the auspices of the unions, certainly what you're going to find is President Obama is going to have a . . . much more difficult time getting elected and winning the state of Wisconsin." *Walker*, 824 F. Supp. 2d at 876 n.17. This singular comment, however overtly partisan, reveals little of the intent of the legislature as a whole when it enacted Act 10 or the governor when he introduced it. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) (noting "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it"). The Supreme Court has recognized as much. *O'Brien* refused to infer discriminatory intent from the floor statements of three congressmen, explaining that courts should not "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383-86. Likewise, *Hill* declined to do precisely that, explaining that "the contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support." 530 U.S. at 724. Indeed, in *Hill* the legislative record showed that legislators passed the statute primarily to address pro-life speech outside abortion clinics, yet *Hill* nevertheless found the statute content neutral. *Id.* at 715; *see also id.* at 724-25 (noting anti-picketing ordinance in *Frisby v. Schultz*, 487 U.S. 474 (1988), held content neutral though "obviously enacted in response to the activities of antiabortion protesters"). And in *Campbell*,

the Fourth Circuit refused the invitation to review the legislative record for evidence of discriminatory intent when the legislature permitted some unions to use payroll deductions but prohibited another union from doing so. 883 F.2d at 1260-62. In any event, we have insufficient basis to ascribe Senator Fitzgerald's personal position to the entire legislature.[10]

At bottom, the use of the state payroll system to collect union dues is a state subsidy of speech. As such, the distinction between public safety and general employees only violates the First Amendment if it discriminates on the basis of viewpoint. Because we conclude that Act 10 is not viewpoint discriminatory, it does not implicate the First Amendment and requires only rational basis review.

---

[10] That is not to say that statements of legislative intent or legislative purpose are never relevant in determining whether the legislature acted with a viewpoint discriminatory motive when choosing to subsidize certain speakers but not others. For example, a statement of legislative purpose contained in a preamble or other uncodified provision, or contained in a conference or committee report could likely provide significant evidence of the legislature's discriminatory motive. Here, we simply hold that one statement of a single legislator does not require invalidation of an otherwise viewpoint neutral and constitutional statute. When ruling a statute unconstitutional, "the stakes are sufficiently high . . . to eschew [the] guesswork" inherent in judicial scrutiny of legislators' statements. *O'Brien*, 391 U.S. at 384.

**B. Act 10's Provisions Survive Rational Basis Review**

The parties necessarily agree that rational basis review governs the Unions' equal protection claims because Act 10 neither affects a "fundamental right[] nor proceed[s] along suspect lines." *Heller v. Doe*, 509 U.S. 312, 319 (1993). Under this standard, a law avoids constitutional scrutiny as long as it bears a rational relationship to a legitimate government interest. *Id.* at 320; *Smith*, 457 F.3d at 652. Importantly, we do not require the state to "actually articulate" the law's purpose or "produce evidence to sustain the rationality" of the classification. *Heller*, 509 U.S. at 320; *see Univ. Prof'ls of Ill., Local 4100 v. Edgar*, 114 F.3d 665, 667 (7th Cir. 1997). Instead, the law is presumed constitutional, and we impose a weighty burden on the Unions—they must "negative every . . . basis which might support" the law because we will uphold it "if there is any reasonably conceivable state of facts" supporting the classification. *Heller*, 509 U.S. at 320; *see Williamson v. Lee Optical*, 348 U.S. 483, 487-88 (1955). This basis need not be in the record so long as it finds "some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 321.

Wisconsin was free to impose any of Act 10's restrictions on all unions. *See Ysursa*, 555 U.S. at 359 (across-the-board payroll deduction limitations survive rational basis review); *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 464-65 (1979) (per curiam) (no right to collective bargaining in general); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 287 (1984) (stating, in the context of collective bargaining, "[w]hen

government makes general policy, it is under no greater constitutional obligation to listen to any specifically affected class"). The Unions instead challenge as irrational the division of public safety and general employees under the Equal Protection Clause. They apparently recognize that distinguishing certain unions that perform crucial tasks survives rational basis review, but they emphatically argue that the way Wisconsin divided the two groups is irrational. According to the Unions, the only explanation for the legislation is the extension of "rank political favoritism" towards the unions that supported the governor's campaign. Specifically, they argue that understanding why Wisconsin classified state motor vehicle inspectors as public safety employees but classified prison guards, the University of Wisconsin Police, and the Capitol Police as general employees requires "the exercise of strained imagination."

In doing so, the Unions invite us to speculate about the legislature's motive, at least in cases, they argue, where the distinctions between the two classes are "so disconnected" from a proffered purpose and "so closely connected" to an illegitimate purpose. This argument has ostensible appeal, but it is unsupported by our case law. Indeed, under rational basis review, we cannot search for the legislature's motive. *See O'Brien*, 391 U.S. at 383 ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."). All that matters is whether the statute, as written, furthers a legitimate government objective. Once we find a "rational relationship between the

disparity of treatment and some legitimate governmental purpose," the act passes constitutional scrutiny. *Srail v. Vill. of Lisle*, 588 F.3d 940, 946 (7th Cir. 2009). For our purposes, animus only invalidates a law when no rational basis exists. *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) (holding "[a]nimus comes into play only when [there is] no rational reason or motive . . . for the injurious action taken by the [legislature]").

The Unions' reliance on *U.S. Department of Agriculture v. Moreno* does not support their position that animus is relevant to our inquiry. 413 U.S. 528 (1973). In *Moreno*, Congress amended the requirements for receiving food stamps to exclude groups of unrelated people living together, sharing common cooking facilities, and purchasing food in common. *Id.* at 530. The Supreme Court noted that Congress apparently attempted to exclude "hippies" from fraudulently benefitting from the system. *Id.* at 534. The Court rejected the Government's contention that Congress could rationally conclude that unrelated people living together were more likely to abuse the system because fraudulent hippies could simply alter their living arrangements by using separate kitchens or purchasing food individually, while unrelated households truly in need of the program would lack the financial resources to make such an arrangement. *Id.* at 535-38. The Court concluded that Congress's classification wholly failed to further the government's interest because those that abused the system would continue to do so and those that Congress intended to help would not—the amendment neither

furthered the program's original purpose of benefiting needy families nor limited the fraud perpetrated by non-needy, unrelated people living together. *See id.* at 538. Viewing *Moreno* in this manner makes the case no different than any other rational basis case. Where, as in *Moreno*, an act furthers no legitimate government interest, it fails rational basis review. *Moreno* is not a case, as the Unions urge, where the Court suggested a statute would have passed rational basis review but for animus towards a particular group.

As unfortunate as it may be, political favoritism is a frequent aspect of legislative action. We said as much in *Hearne v. Board of Education*, 185 F.3d 770, 775 (7th Cir. 1999). There, members of the Chicago Teachers Union challenged on various constitutional grounds, including the Equal Protection Clause, an act of the Republican-dominated legislature that severely curtailed Chicago teachers' job security relative to teachers in other parts of the state. *Id.* at 773. The unions argued, in part, that the Republican legislature retaliated against them for opposing Republicans in the previous election. *Id.* We candidly remarked, "there is no rule whereby legislation that otherwise passes the proper level of scrutiny . . . becomes constitutionally defective because one of the reasons the legislators voted for it was to punish those who opposed them during an election campaign." *Id.* at 775. We went further stating, "[i]ndeed one might think that this is what election campaigns are all about: candidates run a certain platform, political promises made in the campaign are kept (sometimes), and the winners get to write the laws." *Id.*

These sorts of decisions are left for the next election. Accordingly, we must resist the temptation to search for the legislature's motivation for the Act's classifications. We now turn to the three challenged provisions.

### 1. Collective Bargaining Limitations

Wisconsin is correct that the collective bargaining limitations constitutionally promote flexibility in state and local government budgets by providing public employers more leverage in negotiations. This alone, however, is not enough to save the provision because the differential treatment of public safety and general employee unions must also be rational. On this point, the district court upheld the classifications because Wisconsin could rationally believe that Act 10's passage would result in widespread labor unrest, but also conclude that the state could not withstand that unrest with respect to public safety employees.

We agree that Wisconsin reasonably concluded that the public safety employees filled too critical a role to risk such a stoppage. Not only has the Supreme Court previously held labor peace in certain instances is a legitimate state interest, the Court found the interest weighty enough to justify some impingement on the free speech rights of employees who do not belong to a union. *See Ellis v. Bhd. of Ry. Clerks*, 466 U.S. 435, 455-56 (1984); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2290 (2012) (describing "labor peace" as justification for public sector fair-share agreements). And experience has borne out the state's fears: in the wake of Act 10's proposal and passage, thousands descended on

the state capital in protest and numerous teachers organized a sick-out through their unions, forcing schools to close, while the state avoided the large societal cost of immediate labor unrest among public safety employees. Wisconsin was free to determine that the costs of potential labor unrest exceeded the benefits of restricting the public safety unions.

This conclusion is uncontroversial: other courts have upheld distinctions between employee groups with similar classifications. *See, e.g., Am. Fed'n of Gov't Emps. v. Loy*, 281 F. Supp. 2d 59, 65-66 (D.D.C. 2003) (constitutional to prohibit TSA airport screeners from collectively bargaining but permit other TSA employees to do so), *aff'd*, 367 F.3d 932 (D.C. Cir. 2004); *Margiotta v. Kaye*, 283 F. Supp. 2d 857, 864-65 (E.D.N.Y. 2003) (constitutional to eliminate compulsory arbitration for court security officers but not other police officers). Indeed, when pressed at oral argument, the Unions' counsel acknowledged that the state could draw rational distinctions between public safety and general employees for this purpose. However, the Unions contend the way in which Wisconsin separated the two groups negates the legitimacy of the classifications. Fundamentally, they argue Wisconsin should have either classified motor vehicle inspectors as general employees or placed prison guards, the University of Wisconsin Police, and the Capitol Police in the public safety group.

The Supreme Court has continually rejected this sort of argument, stating "[d]efining the class of persons subject to a regulatory requirement . . . requires that some persons who have an almost equally strong claim to

favored treatment be placed on different sides of the line . . . [and this] is a matter for legislative, rather than judicial, consideration." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315-16 (1993) (internal quotations). Thus, in *Village of Belle Terre v. Boraas*, the Court upheld a zoning regulation that permitted two unrelated people to live together but prohibited three or more of them from doing so because such arrangements are more likely to constitute boarding or fraternity houses that nuisance neighbors. 416 U.S. 1, 2, 9 (1974). In doing so, the Court implicitly acknowledged that many of the forbidden households would not cause nuisances and were indistinguishable from permitted arrangements, but the Court refused to invalidate the ordinance because "every line drawn by a legislature leaves some out that might well have been included." *Id.* at 8. Similarly, in *Vance v. Bradley*, the Court upheld a statute that required individuals in the Foreign Service system to retire at age sixty but permitted employees covered by the Civil Service to retire at age seventy. 440 U.S. 93, 96 (1979). The government justified the legislation on the need for a more rapid system of promotions and turnover in the Foreign Service system because youth was more important for the rigors of overseas service. *Id.* at 98-99, 106. The Court acknowledged the law was simultaneously overinclusive and underinclusive because the stated goals applied to many Civil Service jobs and did not apply to certain Foreign Service positions. For instance, only sixty percent of Foreign Service officers served overseas, while five percent of Civil Service officers did. *Id.* at 107. Nevertheless, the statute easily withstood rational basis

review because "perfection is by no means required" and the "provision does not offend the Constitution simply because the classification is not made with mathematical nicety." *Id.* at 108 (internal quotations).

Thus, we cannot, as the Unions request, determine precisely which occupations would jeopardize public safety with a strike. Even if we accept that Wisconsin imprudently characterized motor vehicle inspectors as public safety employees or the Capitol Police as general employees, invalidating the legislation on that ground would elevate the judiciary to the impermissible role of supra-legislature. The judiciary's refusal to take on this role explains why, applying rational basis review in *City of New Orleans v. Dukes*, the Supreme Court hypothesized reasons for upholding the preferential treatment of pushcart vendors that worked for longer than eight years even without a showing that they were more qualified than newer vendors. 427 U.S. 297, 298, 305 (1976) (per curiam). Further, it explains why the Court, in *Lee Optical*, upheld a law allowing only ophthalmologists and optometrists to install prescription eye lenses, even though opticians possessed similar skills. 348 U.S. at 486, 490-91. Distinguishing between public safety unions and general employee unions may have been a poor choice, but it is not unconstitutional.[11]

_____

[11] Moreover, at least with respect to the prison guards, there is an additional possible explanation for their exclusion from the public safety category. The trust fund statute, which Act 10

(continued...)

### 2. Recertification Requirements

Many of the justifications for the collective bargaining limitation also apply to the recertification requirement. As we mentioned, Act 10 exhibits a rational belief that public sector unions are too costly for the state. The recertification process furthers this interest by imposing a recertification burden that impacts unions' influence over employees who are less passionate about union representation. The Unions characterize this voting rule as arcane, but the alternative to Act 10 would appear to be the outright elimination of all general employee unions. Instead, the legislature enacted a law which presumes that when many employees abstain from a recertification election, those employees are, at best, unenthusiastic about the union's representation. In such cases, it is permissible for Wisconsin to rationally

---

[11] (...continued)

cross-references, also excludes them. Thus, it would be understandable if the Wisconsin legislature used that list as a starting point to choose those professions from which it feared a retaliatory strike. Even if we agree with the Unions that Act 10 should have placed prison guards in the public safety category, "a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969). In fact, the Court in *Beach Communications* similarly suggested the disputed FCC distinction survived rational basis because the Commission adopted it from an existing regulatory scheme. 508 U.S. at 317-18.

conclude that the union is not worth maintaining through an automatic recertification process—or, at least, Wisconsin does not want to incur the cost of unions which have uncommitted members.

Because the state clearly has an interest in the recertification requirement, the rational basis for applying it only to general employees flows from the justification for differentially applying the collective bargaining limits. The provision may tend to weaken unions, and Wisconsin rationally feared back-lash—either immediate or eventual (in the event a public safety union later failed to garner recertification sup-port)—if it applied the provision to the public safety unions. The Unions raise the same sorts of arguments against this provision that they did against the collective bargaining provision—that it was irrational to include the motor vehicle inspectors but exclude safety-related unions like the Capitol Police. For the reasons in the previous section, these arguments are unavailing.

### 3.  Payroll Deduction Prohibition

As we explained in Part II.A., because the payroll deduction prohibition does not implicate the First Amend-ment, we analyze this provision under rational basis review.[12] Wisconsin could have rationally eliminated all

---

[12] The district court engaged in two separate rational basis analyses, one under the Equal Protection Clause and another

(continued...)

payroll deductions. *Ysursa*, 555 U.S. at 359 (noting that "the State is not constitutionally obligated to provide payroll deductions at all"). And, as was the case with the other provisions, Wisconsin's differential treatment of general and public safety unions is supported by its concern for labor peace among the public safety employees. The Unions again rely on the alleged "gerrymandering" of the public safety employee definition to challenge the State's justifications for Act 10. But these arguments fail for the same reasons stated above—such line-drawing is not for the courts.

The Unions also label as "wholly implausible" the legislature's fear that a payroll prohibition on public safety employees would trigger an illegal strike. But rational basis review does not require the state to "produce evidence to sustain the rationality" of the law, provided the law has "some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 320-21. The state's fear is rational, particularly considering the controversy surrounding passage of Act 10 and the Unions' own admission before the district court that the

---

[12] (...continued)

under the First Amendment. Rational basis review, however, is not a level of scrutiny under the First Amendment but merely the residual level of scrutiny that courts apply to all laws not involving a suspect class or infringing a fundamental right. *See Ezell v. City of Chi.*, 651 F.3d 684, 701 (7th Cir. 2011). Thus, only one rational basis analysis is necessary.

effect of the payroll prohibition would be "catastrophic." Consequently, the payroll dues prohibition survives rational basis review.

### C. The District Court Did Not Err in Denying Proposed Intervenors' Motion to Intervene

The Employees filed a motion to intervene as of right in support of the state.[13] *See* Fed. R. Civ. P. 24(a)(2). A party has a right to intervene when: (1) the motion to intervene is timely filed; (2) the proposed intervenors possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the named parties inadequately represent that interest. *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). The Unions oppose intervention and challenge only two of these elements: the relationship between the Employees' interest and the subject-matter of the suit, and the adequacy of the state in representing the Employees' interests. This Court applies de novo review to the district court's determination on these two elements, *id.*, neither of which the Employees satisfy.

---

[13] The Employees also sought permissive intervention. The district court did not specifically address that argument, though, and the Employees have not raised permissive intervention on appeal.

### 1. Direct and Substantial Interest

Intervention as of right requires a "direct, significant[,] and legally protectable" interest in the question at issue in the lawsuit. *Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir. 1985). That interest must be unique to the proposed intervenor. *Id.* Moreover, the question of "[w]hether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995).

The Employees assert they have a First Amendment interest in not paying compulsory union fees and in rejecting the union as their state-imposed bargaining agent. However, the Employees largely acknowledge that *Abood v. Detroit Board of Education* and its progeny settle this question. 431 U.S. 209 (1977). There, the Court held that a public sector union could recover expenses related to collective bargaining from nonmembers even though they could not force nonmembers to fund political or ideological union projects. *Id.* at 234. Although this payment "significant[ly] impinge[s] on First Amendment rights" of nonmember employees, the governmental interest in "industrial peace" justifies this intrusion on free speech. *Ellis*, 466 U.S. at 455-56; *see also Knox*, 132 S. Ct. at 2290 (describing "labor peace" as justification for public sector fair-share agreements). Thus, under *Abood* and *Ellis*, the state could properly compel the Employees to pay union charges under fair-share agreements, precisely as it did before passage of Act 10.

The Employees do not dispute any of this, nor do they assert any constitutional right allowing them to escape payment of the union expenses that *Abood* and its progeny have allowed. Instead, they argue that Act 10 "changes the constitutional calculus" underlying this First Amendment analysis. According to the Employees, when the state passed Act 10, it abolished "industrial peace" as a compelling interest that justified the First Amendment concerns of dissenting employees subject to fair-share agreements. This new constitutional calculus, they continue, "opens the door for Employees to directly assert and protect their nascent First Amendment claims" because "[t]here no longer are any sufficiently weighty state interests to justify compromising the First Amendment interests recognized in cases such as *Abood*." Even if that were true, the Employees' First Amendment interests have little to do with the claims raised by the Unions, which focus on the Unions' free speech rights. The question of the Employees' free speech rights is, as the district court explained, tangential.

## 2. Adequacy of Representation

Even assuming a direct interest in the litigation, the state adequately represents the interests of the Employees. The district court applied a deferential standard requiring gross negligence or bad faith to render the state's representation inadequate. However, that standard applies only "when the representative party is a governmental body charged by law with protecting the interests of the proposed intervenors [because] the representative is presumed to adequately represent their

interests unless there is a showing of gross negligence or bad faith." *See Ligas*, 478 F.3d at 774. The state is not charged by law with protecting the interests of the Employees so this standard does not apply. Nevertheless, the state still adequately represented the Employees' interests.

Although intervention requires only a "minimal" showing of inadequate representation, *see Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972), when the prospective intervenor and the named party have the same goal, a "presumption [exists] that the representation in the suit is adequate," *Shea v. Angulo*, 19 F.3d 343, 347 (7th Cir. 1994). The prospective intervenor then must rebut that presumption and show that some conflict exists. *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 205 (7th Cir. 1982). Here, the Employees and the state share the same goal: protecting Act 10 against the Unions' constitutional challenge. The Employees have admitted as much, declaring that "[i]f Act 10 is declared valid, [the] Employees' First Amendment rights are completely vindicated." Thus, by their own admission, the Employees have exactly the same goal as the state. Yet they identify no conflict rendering the state's representation inadequate. Instead, Employees rely largely on post-hoc quibbles with the state's litigation strategy. This does not provide the conflict of interest necessary to render the state's representation inadequate.[14]

---

[14] Nor does the Employees' long list of cases illustrating that

(continued...)

In summation, the district court properly denied the Employees' motion to intervene as of right. They did not articulate a direct, substantial, and legally cognizable interest in the litigation, nor was the state an inadequate representative of their interests. Thus, the district court below, and this Court on appeal, does not need to consider their arguments.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling that the collective bargaining provisions satisfy rational basis, REVERSE the district court's rulings that the recertification provisions and payroll deduction provisions do not satisfy rational basis, and AFFIRM the district court's denial of proposed intervenors' motion to intervene.

---

[14] (...continued)
such intervention happens "frequently" in this Circuit. None of these cases directly addresses the propriety of the intervention in those cases. Instead, each merely recognizes in passing that the intervention occurred at some prior point in the procedural history of the case.

HAMILTON, *Circuit Judge*, concurring in the judgment in part and dissenting in part. Elections have consequences, as this case reminds us. Although the rationales offered for the State's different treatment of collective bargaining for "public safety" employees and "general" employees seem flimsy to me, the highly deferential rational-basis review requires that we uphold the principal provisions of Wisconsin's Act 10 against equal protection challenges. This is particularly true where the federal Constitution would not prevent the State from removing all collective bargaining rights of public employees. I therefore join the portion of the judgment upholding the new statutory limits on the subject matters of collective bargaining for the general employees. For essentially the same reasons, I also concur in the portion of the judgment upholding the unprecedented recertification provisions for unions representing "general" employees, although the reasons for those provisions were not presented to the district court. For the reasons explained in Part II-C of the majority's opinion, I also concur with the affirmance of the district court's denial of the motion to intervene.

I respectfully dissent, however, from the portion of the court's decision upholding Wisconsin's selective prohibition on payroll deductions for dues for some public employee unions but not others. The district court correctly held that the new law's selective prohibition on payroll deductions violates the First Amendment rights of the plaintiff unions and their members. It is well established that a government employer creates what First Amendment doctrine calls a "nonpublic

forum" when it establishes a system for employee
payroll deductions for payment to various third parties,
including labor unions. It is equally well established
under the First Amendment that the public employer
may not engage in political or viewpoint discrimination
when choosing which payroll deductions are allowed.
After close examination of the relevant evidence, the
district court correctly found that Wisconsin's new law
amounts to unconstitutional viewpoint discrimination.
The majority attempts to avoid this result by portraying
the new law as merely denying plaintiffs a "subsidy" for
speech. As explained below, that approach fails to come
to grips with the applicable First Amendment doctrine
and precedents, as well as the evidence showing view-
point discrimination in the new and selective prohibition.

Part I-A of this opinion summarizes the established
First Amendment framework for nonpublic forum
analysis and its application to the union dues withholding
provisions. Part I-B addresses the requirement of view-
point neutrality and shows that we cannot end our
analysis when we find merely facial neutrality. Part I-C
then reviews the evidence showing that the selective
limits on payroll deductions here violate the First Amend-
ment. Finally, Part II explains my reasons for concurring
in the judgment upholding the annual recertification
provisions.

I. *The Discriminatory Limits on Payroll Deductions of Union Dues*

A. *Payroll Deductions as a "Nonpublic Forum"*

On the payroll deduction issue, let's start with the common ground. My colleagues and I agree, as all the parties in the case do, that the federal Constitution does not require the State to "subsidize" the plaintiff unions by continuing to provide payroll deductions for union dues. The majority's emphasis on this uncontroversial point misses the real point of the plaintiffs' First Amendment claim. See *ante* at 9-15. Wisconsin has chosen to create such a system of payroll deductions. The new law keeps that system in place for "public safety" employees and their unions but denies access to that same system for all other public employees and their unions. It's that discrimination that causes the problem here.

The most relevant corner of First Amendment doctrine here is the law applicable to a "nonpublic forum." When a government is not required to open its property for expressive or communicative purposes, but chooses to do so for limited purposes, it has created a nonpublic forum. The general First Amendment standards for a nonpublic forum are settled: "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 806 (1985), quoted

in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392-93 (1993).

As the term suggests, the nonpublic forum may be a literal forum, such as a place where the government provides shelter, heat, light, and security, such as meeting space in a public school in *Lamb's Chapel*. See also, *e.g.*, *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 63 F.3d 581, 586 (7th Cir. 1995) (public building lobby was nonpublic forum for holiday seasonal displays). First Amendment precedents also make clear, though, that a nonpublic forum may be less literal, such as a charitable campaign where the government provides an audience and subsidizes both communications *and even payroll deductions*. In fact, *Lamb's Chapel*, which involved a literal forum, followed *Cornelius*. That case held that the Combined Federal Campaign, which solicits charitable donations from federal employees through payroll deductions, is a nonpublic forum. 473 U.S. at 805-06. Accord, *e.g.*, *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188-89 (2007) (applying nonpublic forum requirements of viewpoint neutrality and reasonableness to public employee union dues withholding system); *Pilsen Neighbors Community Council v. Netsch*, 960 F.2d 676, 685-86 (7th Cir. 1992) (state program for charitable gifts by payroll deduction was a nonpublic forum). See also *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (state university's fund for student organizations was nonpublic forum); *Choose Life Illinois Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008) (specialty license plates were nonpublic forum); *Christian Legal Society v. Walker*, 453 F.3d 853, 865-66 (7th Cir. 2006)

(following *Rosenberger*, applying nonpublic forum analysis to state university fund for student organization).

The majority opinion proceeds as if there were an important difference between the "nonpublic forum" cases, such as *Cornelius*, *Davenport*, and *Rosenberger*, on one hand, and the "subsidy" line of cases. See *ante* at 9-15, citing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) ("subsidy" case); *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) (another "subsidy" case); and *Rosenberger* (a "nonpublic forum" case). There is no important difference. What is a nonpublic forum if not a subsidy? The government is not required to provide any subsidy. Nor is it required to provide the forum, but if it does, there is likely to be some form of at least indirect subsidy, whether in the form of light and heat for a literal forum or modest administrative costs for payroll deductions. Regardless of the preferred label, the essential requirements are the same: a generous standard of reasonableness but a prohibition on viewpoint discrimination, as the majority itself acknowledges. *Ante* at 15.

B. *Nonpublic Forums Require Genuine Viewpoint Neutrality*

So we have a nonpublic forum, which means that the State's selective limits on payroll dues deductions must satisfy the First Amendment requirements for a nonpublic forum, including viewpoint neutrality. As *Cornelius*, *Lamb's Chapel*, *Rosenberger*, and many other cases show, "[s]peech restrictions in a nonpublic forum

must not discriminate on the basis of viewpoint." *Christian Legal Society v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006).

The requirement of viewpoint neutrality in handling public employees' payroll deductions for union dues should not be controversial. Suppose, for example, that a state set up a system allowing payroll deductions for employees' political contributions to the state Democratic Party but not to any other party. We can all agree that such a system would violate the First Amendment. And that would be true even though the state might argue that it was not required to "subsidize" the Republican Party or others. A step closer to this case, suppose a state set up a system allowing payroll deductions of dues for unions that supported the Democratic Party but not for unions with a different political bent. Just as surely that system would also violate the First Amendment, again despite the fact that the state would not be required to provide such a subsidy or service for any unions.

Thus, whether the State is understood to be providing benefits or subsidizing speech, the First Amendment governs the State's decisions that limit access to nonpublic forums and prohibits granting or denying access based on the differing viewpoints of particular groups. "These principles provide the framework forbidding the State to exercise viewpoint discrimination, even when the limited public forum is one of its own creation." *Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set."); see also Elena Kagan, *The*

*Changing Face of First Amendment Neutrality: R.A.V. v. St. Paul, Rust v. Sullivan and the Problem of Content-Based Underinclusion*, 1992 Sup. Ct. Rev. 29, 43 (1996) ("The government may not use its broad discretion over the property it owns to advantage some viewpoints at the expense of others . . . .").[1]

As the majority points out, on its face, Wisconsin's Act 10 seems viewpoint-neutral: public safety unions can have dues withheld from paychecks, while other public employee unions cannot. Facial neutrality, however, is not the end of the matter. The real question here is whether the new law violates — in fact — the well-established requirement of viewpoint neutrality. "Distinguishing between a permissible content-based restriction and an impermissible viewpoint-based restriction is not always easy." *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008).

The Supreme Court has made clear that consideration of viewpoint neutrality or bias does not end with a superficial look at the face of the state's policy. In *Cornelius*, for example, the federal government argued that its exclusion of advocacy groups from the Combined Federal Campaign charity drive was a viewpoint-neutral rule designed to avoid disruption of federal workplaces and ensure the success of the campaign. The

---

[1] The Supreme Court used the term "limited" public forum in *Rosenberger* to describe what is more commonly called a "nonpublic" forum, as shown in *Rosenberger*'s discussion of *Cornelius* and *Lamb's Chapel*. See 515 U.S. at 829.

Supreme Court described those as "facially neutral and valid justifications" for the rule, 473 U.S. at 812, but that was not the end of the case. The Court also noted that other evidence cast doubt on the genuineness of the stated concerns, such as the inclusion of other groups in the campaign that did not seem to fit the stated criteria. There was no requirement that rules limiting access to a nonpublic forum be "precisely tailored," but evidence of a lack of fit between the stated rules and the actual practice gave the Court enough pause to order a remand to pursue the issue of viewpoint neutrality or bias: "While we accept the validity and reasonableness of the justifications offered by petitioner for excluding advocacy groups from the CFC, those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view." *Id*. at 812-13, citing *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980).

Despite the majority's disclaimer in its footnote 7, this passage in *Cornelius* not only encourages but actually directs lower courts to consider claims that an invidious, viewpoint-biased motive lies behind a facially neutral restriction on access to a nonpublic forum. See also *Southworth v. Board of Regents of Univ. of Wisconsin System*, 307 F.3d 566, 594 (7th Cir. 2002) (finding that facially neutral classifications actually favored non-political organizations thereby resulting in viewpoint discrimination); *Pilsen Neighbors Community Council v. Netsch*, 960 F.2d at 686-88 (finding no First Amendment violation with Illinois's system for charitable payroll deductions where criteria were viewpoint-neutral both facially and as applied).

This requirement of genuine viewpoint neutrality, both facially and as applied, is entirely consistent with the Supreme Court's decision in *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353 (2009), upon which the majority relies so heavily. The issue the Supreme Court faced in *Ysursa* was whether the state of Idaho could prohibit local governments from taking payroll deductions for *any* political activities, defined broadly enough to include contributions to unions' political action committees. The Court upheld the state law, reasoning primarily that the prohibition was evenhanded and served the state's legitimate purpose of avoiding the reality or appearance of government favoritism or entanglement with partisan politics. 555 U.S. at 360.

Separate opinions by Justices Stevens, Souter, and Breyer questioned whether the prohibition was in fact evenhanded and viewpoint-neutral. The Court addressed their concern in a lengthy footnote. First, the Court explained that the plaintiffs had not tried to establish viewpoint discrimination in the lower courts. The Court then, in a comment directly applicable to this case, added that if the prohibition were not enforced evenhandedly in the future, "plaintiffs are free to bring an as-applied challenge." *Id*. at 361 n.3, citing *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas'"), quoting in turn *Regan v. Taxation with Representation of Washington*, 461 U.S. at 550.

In other words, *Ysursa* applied First Amendment doctrine to uphold a broad ban on payroll deductions for

union dues that did not discriminate on the basis of viewpoint. That much is common ground in this case. But on the contested issue in this case, the more important point is that *Ysursa* reinforced the established law that viewpoint discrimination in a government's limits on access to a payroll deduction system can violate the First Amendment. 555 U.S. at 361 n.3. This remains true whether one prefers to speak in terms of a subsidy or a nonpublic forum. *Ysursa* simply did not decide an issue like the one we face here, whether Act 10's facially neutral but selective limits on access to public payroll deductions are actually viewpoint-neutral or not.[2]

### C. *The Wisconsin Law and Viewpoint Discrimination*

Following the teaching of *Cornelius* and the other cases discussed above, I turn now to Wisconsin's Act 10 and the actual effects of the restrictions on access to payroll deductions, taking the unions' evidence and the

---

[2] *Toledo Area AFL-CIO Council v. Pizza*, a case cited by the majority as a "subsidy" case, recognized this important differ-ence. In upholding a ban on wage checkoffs, the Sixth Circuit said it was "significant" that the prohibition was universal in its application: "The provision does not single out political contributions to only certain parties, candidates or issues. All Ohio public employees are denied the benefits that might be derived from such publicly-administered pro-grams, regardless of the content of their political views or their party affiliation." 154 F.3d 307, 319 (6th Cir. 1998). The same cannot be said in this case.

State's explanations in turn. Despite the superficial, facial neutrality as to viewpoint, the plaintiffs offered persuasive evidence that the different treatment of "public safety" unions and "general employee" unions is in reality an unconstitutional exercise in viewpoint discrimination. The majority asks the right question but then averts its eyes from the evidence needed to answer it, saying that plaintiffs' arguments "require peering past the text of the statute to infer some invidious legislative intention. We decline this invitation." *Ante* at 19-20.

"Peering past the text" is exactly what we are supposed to do here. "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811. That's what the Supreme Court taught in *Cornelius*, as well as *Ysursa*, and *Lamb's Chapel*. Let's turn to that evidence.[3]

---

[3] To defend its decision not to inquire into the possibility of viewpoint discrimination beyond the face of the statute, the majority relies on inapposite "time, place, and manner" cases, observing that disparate impact on one viewpoint does not "transform a facially neutral statute into a discriminatory one." *Ante* at 20-21, citing *Hill v. Colorado*, 530 U.S. 703 (2000), and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994). The "time, place, and manner" doctrine does not justify a refusal to consider genuine evidence of viewpoint bias in access to a nonpublic forum. Time, place, and manner restrictions must be content neutral and narrowly tailored to serve

(continued...)

1. *Plaintiffs' Evidence of Viewpoint Discrimination*

Consistent with the Supreme Court's teachings, the plaintiffs rely on three points that together show the State's proffered rationale is a pretext for viewpoint (here, political) discrimination. The first is the close correlation between various unions' political endorsements in the 2010 Wisconsin governor's race and their ability to continue payroll deductions. The second is the flimsiness of the State's proffered rationales for drawing the line as it did between public safety and general employees and for barring payroll deductions of union dues for all but public safety employees. The third is

---

[3] (...continued)

a significant government interest, and must leave ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In effect, such laws restrict particular conduct, as in *Hill*, which regulated speech within eight feet of another person without that person's consent. 530 U.S. at 707. This is not the case in which to explore all the First Amendment doctrinal nuances, but these other requirements make viewpoint discrimination more difficult to achieve with time, place, and manner restrictions. The Supreme Court itself has distinguished the two lines of doctrine. See *Madsen*, 512 U.S. at 763-64 ("the injunction issued in this case does not demand the level of heightened scrutiny set forth in *Perry Ed. Ass'n*, 460 U.S. at 45," which was a nonpublic forum case). We should follow the nonpublic forum cases and consider the evidence showing that a facially neutral statute in fact is being used to limit access to an important nonpublic forum based on political viewpoint.

the overtly partisan political explanation for the Act that was offered in the legislative debate.

a. *Political Endorsements of the Affected Unions*

Five unions representing public sector employees endorsed then-candidate Walker for governor during the 2010 campaign: the Wisconsin Troopers Association, whose members are state troopers and motor vehicle inspectors; the Milwaukee Police Association; the Milwaukee Professional Fire Fighters Association; the West Allis Professional Police Association; and the Wisconsin Sheriffs and Deputy Sheriffs Association Political Action Committee. The members of all five organizations are included in the new law's "public safety" classification. They all retained their full collective bargaining rights, including payroll deductions for union dues and fair share payments.

The net effect is that all public employees represented by unions that endorsed Governor Walker continue to enjoy collective bargaining, and those unions continue to benefit from payroll deductions. On the other hand, nearly all members of the public employee unions that did not endorse Governor Walker are categorized as "general" employees. Their bargaining rights have been reduced to a hollow shell and payroll deductions are not available for their union dues. The correlation is admittedly not perfect — some other local police and fire unions did not endorse Governor Walker but are "public safety" employees — but it's very strong. As the district court noted, the "fact that *none* of the public

employer unions falling into the general category endorsed Walker in the 2010 election and that *all* of the unions that endorsed Walker fall within the public safety category certainly suggests that unions representing general employees have different viewpoints than those of the unions representing public safety employees." *Wisconsin Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d 856, 873 (W.D. Wis. 2012).

### b. *The State's Explanations*

Of course, the correlation between political allegiance to the governor and continued access to payroll deductions could be just a coincidence, a result of a reasonable policy decision to treat public safety employees differently than other public employees. Legislation is not unconstitutional just because it favors political supporters or harms opponents. See *Hearne v. Board of Educ. of City of Chicago*, 185 F.3d 770, 775 (7th Cir. 1999).

The State argues that public safety employees were treated more generously because they were in a position to strike (albeit illegally) and thereby to undermine public safety.

A closer look undermines that explanation. The state employs many police officers, firefighters, and others with important public safety responsibilities who are excluded from the "public safety" classification of Act 10. If the State's proffered explanation for treating "public safety" employees differently were actually true, it would be hard to understand why that explanation

would not apply as well to police officers at the University of Wisconsin, Capitol Police officers, the State's thousands of correctional and probation officers, and many others with important public safety duties. Instead, those employees, whose unions did not endorse Governor Walker, are treated as general employees, and their unions do not benefit from payroll deductions.

As the district court explained, one particular gerrymander of the legislative classifications illustrates the problem well. The Wisconsin Law Enforcement Association (WLEA) has been the collective bargaining representative for state troopers, other employees of the Wisconsin State Patrol, and many other law enforcement personnel who work for the state, including the Capitol Police and the University of Wisconsin Campus Police. Within the WLEA, only the Wisconsin Troopers Association (WTA), which is the lobbying group for employees of the Wisconsin State Patrol, endorsed Governor Walker in the 2010 campaign. The WTA includes both state troopers and state motor vehicle inspectors. The new law was drawn up to treat all WTA members — motor vehicle inspectors as well as state troopers — as favored "public safety" employees. But the law treats all other groups within the WLEA, and recall that it is the Wisconsin *Law Enforcement* Association, including the Capitol and University of Wisconsin Police, as only "general" employees.

Perhaps a strike by motor vehicle inspectors might threaten the breakdown of public order and state government, but it's hard to see how. It's especially hard to

see how the threat of a strike by motor vehicle inspectors could reasonably be deemed more significant than a strike by, say, correctional officers or many other law enforcement officers excluded by the new law. The district court recognized this as well, noting that in the context of the dues withholding provision and annual recertification requirements, "the relationship between the interest of avoiding strikes and these other challenged provisions is substantially more tenuous." *Wisconsin Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d at 868. In the context of employment discrimination law, such an implausible explanation is treated as a pretext, which allows a reasonable inference of unlawful discrimination. *E.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). That's what we have here, too.

The State's and majority's reasoning is even harder to understand when we consider the State's own analysis governing the classifications. The Deputy Secretary of the Wisconsin Department of Administration assisted in developing and analyzing Act 10 and explained the line-drawing process in an affidavit. She was in part responsible for "planning for contingencies arising from the enactment of Act 10 including potential job actions and strikes." As part of this analysis, she assessed which departments provided "critical state services," the interruption of which would threaten public safety. The assessment concluded that the Department of Corrections and its staff were crucial. It further found that even with the National Guard's standing plan to replace the Department of Corrections

if necessary, "there were insufficient State resources" to "fulfill the backfill staffing requirements to ensure the continuation of critical services in the event of a mass job action." Supp. App. at 130-32.[4] Despite these findings, the prison guards, who the record shows are crucial to public safety and have a history of striking, were classified as "general" employees and *not* as "public safety" employees. Their union did not support Governor Walker in the election.

The internal analysis also "identified a probable gap in staffing for state building and staff security in the event of large scale protests." *Id.* at 132. Yet the Capitol Police were also categorized as "general employees" deemed not critical to public safety in the event of a mass action. That mass action did in fact occur on the steps of the very Capitol that, after the passing of Act 10, risked being understaffed in the event of a strike in response to Act 10.

I recognize, of course, that when governing access to a nonpublic forum, the State is not required to draw these lines perfectly, see *Cornelius*, 473 U.S. at 808-09, but this internal analysis clearly undermines the viewpoint-neutral justifications offered by the State. As

---

[4] To avoid the deposition of the Deputy Secretary, the State moved to withdraw this affidavit in the district court. Plaintiffs did not oppose this withdrawal and the district court therefore granted the request but reserved the right to rely on it to the extent it was relied upon by plaintiffs. *Wisconsin Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d at 862.

Justice Kagan has written, "the looser the fit between the interest asserted and the contours of the law, the greater the cause for suspicion. At a certain point — when the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation — the usual presumption of proper purpose topples; there is reason, then, to think that the law, though content neutral, has been tainted by impermissible purpose." Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 455 (1996). The State has reached that point with the selective payroll deduction provisions of Act 10.

The State also argues more specifically that the selective prohibition on payroll deductions for union dues serves the purpose of "favoring employee choice." This explanation is so specious that it only adds further support for the district court's conclusion that the State's explanations are pretexts. Under Act 10, general employees cannot be required to pay union dues or fair share payments. Even if payroll deductions were still available, they would be available only from those union members who voluntarily chose to pay dues in that way. Denying those employees the ability to make voluntary payments through payroll deductions does not even arguably promote "employee choice" for those employees.

By comparison, the State is continuing the practice of payroll deductions for the favored public safety unions that supported Governor Walker. Those unions are still entitled to require payment of union dues or fair share

payments from all members of the bargaining unit. The continued payroll deductions for those unions therefore include entirely involuntary payments by employees who are not union members and who object to the payments and payroll deductions. If "employee choice" were actually the favored policy, the State's selective decision to prohibit voluntary payroll deductions for the benefit of some unions while still enforcing involuntary payroll deductions for the favored unions is difficult to understand.

### c. *Legislative Debate*

In the district court the State relied solely on an argument that the First Amendment simply did not apply to its decisions about payroll deductions. That defense was mistaken for reasons already explained. In considering the payroll deduction provisions, the district court noted "the only justification in the record for prohibiting dues withholding for general employees *is* limiting the speech of that class of unions. During the intense legislative debate on what became Act 10, Senate Majority Leader Scott Fitzgerald commented that '[i]f we win this battle, and the money is not there under the auspices of the unions, certainly what you're going to find is that President Obama is going to have a . . . much more difficult time getting elected and winning the state of Wisconsin.'" *Wisconsin Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d at 875-76 n.17 (ellipsis in original).

Helping one side win elections is certainly a *rational* reason for the payroll deduction limits, and the limits

were designed well to serve that purpose. But under the First Amendment, of course, it's not a *permissible* reason for restricting access to the nonpublic forum of payroll deductions. It's transparent viewpoint discrimination. So the State and the majority need to sweep the majority leader's candid statement under a rug.

The argument against relying on the majority leader's statement is the familiar one about legislative motive exemplified by *United States v. O'Brien*, where the Supreme Court upheld a law making it a federal crime to burn a draft card: "Inquiries into congressional motives or purposes are a hazardous matter. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." 391 U.S. 367, 383-84 (1968).

As a general rule, the *O'Brien* point is certainly correct, and if the majority leader's speech were the only evidence of viewpoint discrimination, it would be difficult to find a First Amendment violation based solely on that one speech. But neither *O'Brien* nor many other Supreme Court decisions require that we wear blinders to block our view of reality when we examine a serious claim that the legislature chose to engage in unconstitutional viewpoint discrimination, especially

when that evidence of legislative purpose corroborates other, more familiar and comfortable forms of evidence. "In short, the relevance of motive to constitutional adjudication varies by context. No automatic cause of action exists whenever allegations of unconstitutional intent can be made, but courts will investigate motive when precedent, text, and prudential considerations suggest it necessary in order to give full effect to the constitutional provision at issue." *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1294 (7th Cir. 1996). "Motive may thus be a vital piece of evidence that courts must use to judge the viewpoint-neutrality of the regulation." *Id.* at 1298; see also Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. at 442 (reading *O'Brien* to stand for "a narrower proposition, relating not to the propriety of inquiring into motive, but to the means by which to conduct this inquiry").

The evidence of unconstitutional legislative purpose here is similar to evidence of legislative purpose the Supreme Court has relied upon in other cases, such as *Wallace v. Jaffree*, 472 U.S. 38 (1985), which struck down a state law authorizing a daily moment of prayer or meditation in public schools. The sponsor testified after the enactment that his purpose was to "return voluntary prayer to our public schools." *Id.* at 43. The sponsor's statement was relevant and probative, at least where it corroborated other evidence indicating an unconstitutional motive. *Id.* at 57 (Stevens, J.), and 65 (Powell, J., concurring). The same is true of evidence of motive in

*Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987) (relying in part on legislative sponsor's statements about purpose to strike down law requiring teaching of creationism), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66, 268 (1977) (considering evidence of legislators' racial motives as part of larger set of evidence regarding reasons for refusal to rezone property to allow multiple-family housing). Cf. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 n.9 (1983) (finding no viewpoint discrimination in nonpublic forum, in part, because "there is no indication in the record that the policy was motivated by a desire to suppress the PLEA's views"). See also John Hart Ely, *Legislative & Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1279 (1970) (arguing that *O'Brien* does not eliminate motive's "proper role of triggering demands for legitimate defense which would not otherwise attach"). The district court did not err by taking into account the majority leader's overtly partisan explanation for the different treatment of the different unions, and that evidence should not be ignored here.

### 2.   *The State's Additional Justifications*

For the first time on appeal, the State has advanced three additional reasons for the selective prohibition on payroll deductions for union dues. The State contends that it no longer has any interest in securing the stability and continuity of "general employee" unions because they no longer have meaningful collective bargaining

rights. Therefore, the State argues, it cannot justify the additional expenditure or alleged increased exposure to liability of withholding dues for "general employees." These additional justifications all center on the argument that, as the State puts it in its reply brief, "public safety" unions after Act 10 have a "fundamentally different relationship with the State and municipal employers than other employee organizations" by dint of their full collective bargaining rights. State Reply Br. 40. From this premise, the State argues, it is reasonable for it to create a nonpublic forum to "assist those employee organizations whose members have full collective bargaining privileges in the collection of their dues." State Reply Br. 33. This argument was waived in the district court; even on its merits it is merely circular.

On the waiver point, in the district court, the State's only response to plaintiffs' First Amendment challenge to the payroll deduction provision was an argument that the First Amendment simply did not apply. *Wisconsin Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d at 875 ("In defending against plaintiffs' First Amendment challenge, defendants exclusively argue that the prohibition on the withholding of union dues from paychecks of general employees does not implicate the First Amendment."). That position was obviously mistaken; my colleagues and I agree to that extent, at least. As a result, the State's entire defense on appeal was a creation solely for the appeal. The State's handling of the issue amounts to a waiver of other theories of defense. See, *e.g.*, *Fednav Int'l Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) ("[A] party has waived the ability to make a

specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms."); *Domka v. Portage County*, 523 F.3d 776, 783 (7th Cir. 2008) ("[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted).[5]

The majority has chosen, however, to indulge this tactic by allowing the State to prevail based on arguments that were never made to the district judge. I disagree, but even more to the point, the State's late and *ad lib* attempt to come up with a viewpoint-neutral defense of the payroll deduction policy is further evidence that the defense is just a pretext for unconstitutional viewpoint discrimination.

On the merits of this new argument, the State cannot avoid investigation into viewpoint discrimination by defining the nonpublic forum as one intended to support a certain viewpoint, even if the definition is

---

[5] Plaintiffs did not argue that the State waived these defenses (though they noted that the defenses were asserted for the first time on appeal), but the waiver doctrine is designed for the protection of the court as much as for that of an opposing party, "and therefore need not be asserted by a party for us to invoke it." *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (citations omitted).

framed in a facially neutral way. And yet that is exactly the argument advanced by the State when it explains that, "to the extent the payroll systems are considered nonpublic fora, the purpose of the fora is to facilitate dues deductions for those organizations that serve employees with full collective bargaining privileges." State Reply Br. 36.[6]

We have previously acknowledged the potential to camouflage impermissible viewpoint discrimination by cloaking it in facially neutral classifications. "Because subject matter discrimination is clearly constitutional in nonpublic fora, classifying a particular viewpoint as a subject rather than as a viewpoint *on a subject* will justify discrimination against the viewpoint. This inherent manipulability of the line between subject and viewpoint has forced courts to scrutinize carefully any content-based discrimination." *Grossbaum v. Indianapolis-Marion*

---

[6] *City of Charlotte v. Local 660, Int'l Ass'n of Firefighters* upon which the State relies for support that it can pick and choose who participates in its nonpublic forums does not support the corollary point the State hopes it does, namely that the legislature's choices are wholly immune from judicial review. 426 U.S. 283 (1976). The Supreme Court determined that the regulation in question, which allowed only those wage deductions that benefitted *all* city or municipal employees, was reasonable. The Court focused on the fact that the City had "not drawn its lines in order to exclude individual deductions," and therefore found this universal ban on all checkoffs for any unions both rational and compatible with the Equal Protection Clause. *Id.* at 288.

*County Bldg. Auth.*, 100 F.3d at 1298 (citations omitted). The State may not, therefore, pick and choose who may participate in the nonpublic forum based on the speaker's viewpoint. This protection applies to both the definition of the purpose of the nonpublic forum and to the criteria for eligibility to participate in that forum. We should affirm the district court's decision striking down the ban on payroll deductions of union dues for "general" public employees.

II. *The Annual Recertification Requirement*

I concur in the portion of the judgment upholding the annual recertification requirement against the equal protection challenge. It is for me a close question. This provision and its flimsy justifications raise concerns very similar to those regarding the dues withholding provision. In essence, though, rational-basis review under the Equal Protection Clause is much more forgiving than the First Amendment standard for a nonpublic forum. Even so, we should also acknowledge that the basis for reversing this portion of the district court's judgment consists of arguments the State never presented to the district court. But for the broad deference to legislatures under rational-basis review, I would deem these arguments waived and conclude as the district court did that there was no rational basis for this unprecedented and punitive provision.

The district court applied rational-basis review to the annual recertification provisions. (The district court acknowledged that the provisions might present First

Amendment issues similar to the payroll deduction provision. The plaintiffs did not pursue such a theory, though, and I also do not consider it.) Under rational-basis review, the legislature has the "widest possible latitude within the limits of the Constitution." *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 510 (1937). The plaintiffs have the burden to "negative every conceivable basis which might support" the legislation. *Lenhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (citations omitted); see also *Nordlinger v. Hahn*, 505 U.S. 1, 17 (1992) ("Petitioner has not demonstrated that no rational bases lie for either of these exemptions.").

Rational-basis review creates the odd phenomenon that arguments to justify challenged legislation may be raised for the first time on appeal. Each level of the judiciary is charged with using its imagination to identify any possible legitimate reason for the challenged law. See *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 312, 320 (1993) (reversing circuit court's finding that law was unconstitutional after identifying "plausible rationales," and explaining that the "assumptions underlying these rationales may be erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immunize' the congressional choice from constitutional challenge"), citing *Vance v. Bradley*, 440 U.S. 93, 112 (1979); see also *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) ("Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative 'any reasonably

conceivable state of facts that could provide a rational basis for the classification.'") (citations omitted).

All of this is to say simply that rational-basis review is one of those unusual alcoves in the law where we overlook a party's failure to present its case to the district court. Given this leniency afforded to the State, I concur with the result on this issue, noting that the district court itself, recognized this would be the appropriate disposition "but for," in its words, "defendants' failure to articulate and this court's inability to posit, how an annual, absolute majority vote by a wholly-voluntary union could rationally advance a reasonable purpose." *Wisconsin Educ. Ass'n Council v. Walker,* 824 F. Supp. 2d at 869.

I also agree with the district court's observation that requiring a majority of all eligible voters is nearly unprecedented and seems irrational, at least if one assumes for purposes of argument that the law was not intended to be part of a political reward for supporters and punishment for opponents. *Id.* at 869. To understand this, suppose we applied the same approach to elections for presidents or governors: assume that all eligible voters who do not vote should be counted as "no" votes or "none of the above" votes. The votes for "no" or "none of the above" would win virtually every election.[7] Even in the most lopsided presidential elections

---

[7] Scholars have coined the term "voter eligible population" (VEP), which is a smaller universe than the voting age popula-

(continued...)

of the past century, the number of eligible nonvoters exceeded the winner's popular vote.[8] The same is true of Wisconsin gubernatorial elections.[9]

---

[7] (...continued)
tion (VAP). The VAP includes all people 18 and older who are theoretically able to vote, while the VEP excludes from that number felons, noncitizens, and mentally incompetent individuals, all of whom would be legally barred from voting. For an in-depth explanation of the methodology used to formulate the VEP, see Michael McDonald & Samuel L. Popkin, *The Myth of the Vanishing Voter*, 95 Am. Pol. Sci. Rev. 963 (2001) [hereinafter Myth of the Vanishing Voter]. Professor McDonald, a leading scholar in the field, has collected some of this data online as well. See *United States Elections Project, last visited* Jan. 16, 2013, *available at* http://elections.gmu.edu/[hereinafter U.S. Elections Project].

[8] In 1984, for example, approximately 161,980,000 people were eligible to vote. President Ronald Regan received 54,455,074 votes, which were just 33.6 percent of the VEP. (For the total popular vote, see Congressional Quarterly, Presidential Elections Since 1789 at 132 (4th ed.) [hereinafter Congressional Quarterly]. To calculate the total VEP, see Myth of the Vanishing Voter at 966, which reports what percentage of the VEP is constituted by the total popular vote.) In 1964, there were approximately 112,492,000 eligible voters. President Lyndon Johnson received 43,126,584 votes, which were just 38.3 percent of the total VEP. See Congressional Quarterly at 127, and Myth of the Vanishing Voter at 966.

[9] In the 2010 Wisconsin gubernatorial election, there were approximately 4,170,500 eligible voters. Governor Walker

(continued...)

It is far from clear why completely voluntary unions with minimal bargaining rights could need annual recertification under voting rules that would undermine our nation's democracy if applied to government elections. As legitimate bases for the annual recertification provisions for unions representing general employees, the State argues that they will promote employee choice and that, because the rest of Act 10 has weakened the powers of these unions so much, the

---

9  (...continued)

received 1,128,941 votes, which were 27 percent of the VEP. For the 2010 election results, see Wisconsin State Government Accountability Board (GAB), *GAB Canvass Reporting System*, Dec. 8, 2010, *available at* http://gab.wi.gov/sites/default/files/percent%20results%20post%20recount_120710.pdf [hereinafter GAB Data]. For the calculation of the Wisconsin 2010 VEP, see U.S. Elections Project, *available at* http://elections.gmu.edu/Turnout_2010G.html. In the 2006 Wisconsin gubernatorial election, there were approximately 4,064,500 eligible voters. Governor Doyle received 1,139,115 votes, which were 28 percent of the VEP. See U.S. Elections Project, *available at* http://elections.gmu.edu/Turnout_2006Ghtml, and GAB Data, *available at* http://elections.state.wi.us/docview.asp?docid=10080&locid=47. In the 2002 Wisconsin gubernatorial election, there were approximately 3,908,000 eligible voters. Governor Doyle received 800,515 votes, which were 20 percent of the VEP. See U.S. Elections Project, *available at* http://elections.gmu.edu/Turnout_2002Ghtml, and Dave Leip's Atlas of U.S. Presidential Elections, *available at* http://uselectionatlas.org/RESULTS. (All websites last visited Jan. 16, 2013).

State simply has little to no interest in providing for stability in union representation of these employees. By contrast, because public safety employee unions retain their traditional powers, the State says, it has a substantially greater interest in stable representation so that it can negotiate and work with familiar counterparts. Under rational-basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications*, 508 U.S. 307, 315 (1993). That's about the most that can be said in favor of the annual recertification requirement, other than as punishment of political opponents.[10]

\* \* \*

---

[10] Act 10's overall aim of cost saving does not appear to justify this provision, for the record suggests that annual recertification will actually cost the State money. A letter from the Wisconsin State Employment Relations Commission to the Secretary of the Department of Administration voiced "grave concerns" about the annual recertification provision. Supp. App. at 98. The letter detailed the administrative impossibilities of conducting these annual recertifications on site and the considerable strain this would have on administrative resources given that it was a "labor intensive endeavor." *Id.* The Commission estimated, based on past experience, that the postage alone would cost the State $176,000 for every 200,000 employees. *Id.* at 99.

As I said at the outset, elections have consequences. The United States Constitution does not forbid all legislation that rewards friends and punishes opponents. The principal provisions of Wisconsin's Act 10 may fit that description, but they are still constitutional under the generous standard of rational-basis review. The new, selective limits on payroll deductions for union dues, however, are subject to the more demanding First Amendment standards for a nonpublic forum and flunk that test. I would affirm that portion of the district court's judgment.